# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 15, 2010 Session

## SHEM MALMQUIST v. DANIELLE MALMQUIST

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-001298-05      Jerry Stokes, Judge**

---

**No. W2007-02373-COA-R3-CV - Filed March 25, 2011**

---

This is a divorce case involving a short-term marriage. The husband is a pilot at FedEx and the wife is highly educated. They have two children together. After less than five months of marriage, the husband filed for divorce alleging irreconcilable differences and inappropriate marital conduct. The wife counter-claimed, and unnecessarily protracted litigation ensued. The parties inundated the trial court with filings over a two-year period, many of which contained alarming but ultimately unproven accusations. After one transfer of the case and the withdrawal of many attorneys, the parties proceeded to trial during which they presented the live testimony of 30 witnesses and introduced 122 exhibits. The trial court awarded a divorce to both parties on the ground of inappropriate marital conduct, designated the husband as primary residential parent, granted the wife supervised visitation with the children twice a week, awarded the wife half of the 401k benefits the husband accrued during the marriage, and provided the wife transitional alimony for four months. The wife appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Danielle Malmquist, *Pro se*.

Shem Malmquist, *Pro se*.

## OPINION

### I. Background and Procedural History

The plaintiff/appellee, Shem Malmquist ("Husband"), and the defendant/appellant, Danielle Malmquist ("Wife"), began a romantic relationship in 2003 after Husband—then married to his

second wife—placed a personal ad in a California newspaper. The parties dated and later resided together for several months after Wife become pregnant with their first child. After a brief split, the couple reconciled and Wife became pregnant with their second child. Husband then moved to Memphis, Tennessee with his job as a pilot at FedEx. He sold his California residence and used a portion of the proceeds to pay off Wife's student loans as well as her outstanding obligation on a BMW automobile. He also used a portion of the proceeds, which he deposited in a joint bank account opened in Memphis, to purchase a home in Germantown, Tennessee. Despite Wife's protestations, Husband placed the Germantown residence in his name only. The parties eventually married on October 27, 2004—the same day Husband received a divorce from his second wife—and Wife moved into the Germantown residence. Wife lived at the Germantown residence for a short period before giving birth to their second child in February 2005.

In early March 2005, the parties had a fight during which Wife admittedly punched Husband in the face. Local police responded, interviewed the parties, and arrested Wife. Husband shortly thereafter filed a complaint for divorce alleging Wife was emotionally unstable, physically abusive, verbally abusive, and suffering from severe postpartum depression. According to Husband, Wife's physical assaults included an attack during which she incidentally struck her first child as well as a separate attack during which she struck Husband and threw a glass vase at his head. Husband further alleged Wife had a history of filing false claims with the police and the courts, including a false claim against Husband's ex-wife for kidnapping the parties' first child. Husband concluded Wife's actions constituted inappropriate marital conduct and posed a substantial risk of immediate and irreparable harm to Husband and the children. Husband accordingly sought a grant of divorce and an appointment as primary residential parent of the parties' children.

Husband also requested that the trial court order Wife to undergo an immediate psychological evaluation, enjoin Wife from seeing the children except through supervised visitation, and order Wife to vacate the Germantown residence following an expedited hearing. In response, the trial court set an expedited hearing on the request for injunctive relief and psychological evaluation. The court ordered both parties to undergo a psychological evaluation and to deliver the psychologist's report to the court prior to the hearing. The court further ordered Wife to appear and show cause why Husband's prayer for relief should not be granted. Wife responded with an answer and counter-complaint for divorce. In her answer, Wife rejected Husband's characterization of their physical altercations. She alleged, to the contrary, Husband's physically and verbally abusive behavior forced her on numerous occasions to defend herself. Wife contended the March 3 incident, for example, stemmed from Husband's forcing himself on her sexually despite her demands that he stop, and she only struck Husband in order to protect herself. Wife further contended Husband's account of the March altercation was incomplete. According to Wife, she immediately drove to First Tennessee Bank after discovering her purse with all her credit cards and asset information had disappeared during the short time when Husband had exclusive use of the home. She reportedly discovered Husband "cleaning out" the parties' joint bank account, which she attempted to prevent to no avail. Thereafter, a confrontation ensued over personal files Wife discovered in Husband's vehicle, and Husband allegedly punched Wife in the stomach.

Wife's counter-complaint added that Husband, not Wife, was unfit to care for the parties' children pending psychological evaluation. Wife alleged that, in addition to the March incident, Husband had on several occasions during the marriage forced himself on her. He also placed her in fear multiple times when he punched, cut, and otherwise attempted to harm himself. Wife contended these actions, in conjunction with Husband's removal of the young children from their mother, demonstrated a substantial risk of immediate and irreparable injury to the children. Wife accordingly asked the court to order a psychological evaluation, order Husband to remain away from the marital residence during the divorce, order Husband to replace $9,000 in marital funds removed from the parties' joint bank account, grant her a divorce on the ground of inappropriate marital conduct or irreconcilable differences, designate her as primary residential parent, and equitably divide the parties' marital property. Wife also requested an award of alimony, child support, attorney's fees, and expenses.

On March 10, 2005, the parties entered a consent order on custody of the children pending the expedited hearing. The parties agreed Husband would have temporary physical custody of their first child and Wife would have temporary physical custody of their second child. The parties further agreed Wife would vacate the Germantown residence and Husband would pay for Wife to stay in a hotel room with at least two furnished bedrooms. The consent order permitted Wife to take the baby furniture and necessities with her and required Husband to reimburse her for certain expenses. The consent order also established a temporary visitation schedule for each parent and required all discussions between Husband and Wife regarding the children to occur through counsel. Finally, the order provided Dr. John Ciocca would conduct the court-ordered psychological evaluations of both parties and report his findings. On March 22, 2005, the parties agreed to continue the expedited hearing and remain bound by the March 10 consent order as slightly amended.

The March 10 consent order governed the custody and visitation issues until late November 2005. In the interim, the court appointed a guardian ad litem for the minor children. Wife moved for and received support pendente lite, which remained a constant source of dispute throughout the case. The parties filed and fiercely litigated various motions. Minor disputes turned into irreconcilable conflicts. Attorneys came and went.[1] Competing petitions for contempt were filed. Motions to compel were filed. All the while the parties incurred substantial attorney's fees.

The case appears to have taken a turn for the worse in November 2005.[2] According to Wife, Husband appeared at her apartment on November 30, 2005, while she was exercising visitation with

---

[1]Dorothy Pounders of the Pounders Coleman law firm represented Husband for the entirety of the trial court proceedings. Wife, on the other hand, employed at least nine different attorneys.

[2]The GAL filed a petition to place the children in foster care which suggests the intense acrimony may have started well before November 30. She stated in her petition the parties made numerous, if not daily, allegations of abuse and neglect throughout this case. Her petition asserts "[t]he children were constantly subjected to doctor or emergency room visits to document allegations and the police were called so frequently that they know and dread the names of the parties."

one of the children.[3] Husband reportedly threw an unidentified substance on her and the child and struck her with something wrapped in his hand. Wife thereafter rushed the child to the hospital because she believed he had ingested a foreign substance.[4]

Husband offered an entirely different version of events. According to Husband, he learned from the GAL shortly after having dinner with friends on the evening in question that Wife and one of their children had been taken to the hospital. He contacted the Germantown Police Department ("GPD") and a detective asked to meet with him. The detective explained Wife had alleged Husband physically assaulted her and exposed the child to a petroleum-based product. Husband met with GPD and later filed a petition to restrict Wife's visitation. Husband asserted in his petition that Wife's claims were false and lodged only to prevent him from parenting his children.

The November 30 incident initiated investigations by both GPD and the Department of Children's Services ("DCS"). Neither GPD nor DCS ultimately took action against Husband. The incident appears, however, to have spurred Husband, DCS, the GAL, and the maternal grandparents to file dependency and neglect petitions with the Shelby County Juvenile Court.[5] On December 27, 2005, a juvenile court referee found the children in immediate need of protection and awarded temporary custody to Husband. The parties subsequently entered a consent order briefly allowing Wife to exercise supervised visitation with the children. Unfortunately, this order resulted in a second set of serious allegations regarding the exposure of the children to gasoline. Husband responded to these allegations with a petition for injunctive relief to prohibit Wife from exercising visitation with the children. Husband's petition explained Wife filed a complaint with DCS alleging one of the children's diapers smelled of gasoline, which Husband alleged could only have occurred as a result of Wife's intentional conduct.

On February 24, 2006, the juvenile court sustained Husband's and the GAL's petitions for dependency and neglect, awarded custody of the children to Husband, and granted Wife supervised

---

[3]The statement of the evidence suggests Wife testified that this event involved the parties' first child. The GAL's petition for dependency and neglect alleges the incident concerned the parties' second child, as does Father's petition. The trial court's statement of the evidence may contain a scrivener's error or Wife may have testified regarding their first child. We are unable to determine which is the case on the record before us. Nevertheless, the significance of the event does not depend on which child was allegedly subjected to harm.

[4]The GAL suggested in a petition filed with the trial court that treatment of the parties' second child revealed he swallowed nothing harmful.

[5]The maternal grandparents also filed a motion to intervene in the divorce case, which the trial court granted. They participated in the case for a period but later voluntarily non-suited their intervening petition for custody as well as their appeal from the juvenile court's finding of dependency and neglect.

visitation at the Exchange Club Family Center ("Exchange Club") for one hour per week.[6] Wife appealed the juvenile court's decision and the circuit court assumed jurisdiction over the *de novo* hearing. The circuit court thereafter consolidated the dependency and neglect proceedings with the divorce case.[7]

The case continued to spiral downward after Wife lost custody of the children. On May 22, 2006, Husband filed a petition for injunctive relief asking the court to enjoin Wife from filing any pleading in any other court, including the Superior Court of California for San Mateo County, requesting adjudication of issues presently before the Shelby County Circuit Court. Husband explained Wife caused to be filed a temporary restraining order and child custody order in the California court which awarded physical and legal custody of the parties' children to Wife. Wife attempted to have Shelby County law enforcement execute this order in May 2006 and deliver custody of the children to Wife in direct violation of the Tennessee custody order.

On May 24, 2006, the Honorable James Russell transferred the case due to a conflict. The Honorable Jerry Stokes acquired responsibility for the case under a random selection process and presided over the divorce through completion. On June 1, 2006, Judge Stokes entered an order on Husband's prior request for injunctive relief. The court enjoined Wife from filing any pleading or proceeding in any other court, including the Superior Court of California for San Mateo County, regarding adjudication of any issue within the jurisdiction of the circuit court including requests for custody of the children and temporary support. The court further required Wife to relinquish to Husband any travel documents she may have had in her possession for either child including but not limited to passports. The court also awarded Husband attorney's fees and litigation expenses for having to file and proceed with his petition. This issue, however, would remain a source of dispute throughout the proceedings.

On June 2, 2006, Wife petitioned for an order of protection against Husband. Her petition alleged:

> On 1/21/2005 while I was trying to protect [our first child] from one of [Husband's] rages, [Husband] pushed [us] down three flights of stairs while I was eight months pregnant. I was transported to the Emergency Room and suffered a grade four sprained ankle and an injured hip. On 3/03/2005 in front of both children [Husband] assaulted me and raped me and knocked [our second child], then a newborn, down on the ground. On 11/30/2005 [Husband] attacked me with a knife and tried to make [our second child] drink Kerosene. Both [my second child] and I were transferred to the Emergency Room and I suffered concussion, a hip injury and wounds. Since 11/30/2005 I have been stalked and harassed by private investigators hired by

---

[6]The circuit court later modified the visitation schedule to provide Wife six hours of supervised visitation per week at the Exchange Club.

[7]The record on appeal does not include the record of the juvenile court proceedings.

[Husband]. In 3/2006 & 4/2006 [Husband] sent my family a letter stating that if I attempted to visit the children "an unexplained accident will occur to the children." On 4/3/2006 [Husband] drugged me and raped me which is currently under investigation. On 5/08/2006 I had to call the police because I was followed from my parent's house in California to my Grandmother's house. On 5/24/2006 my father, Claudio Nicolosi[,] recived [sic] a note on his apartment door in Cordova, Tennessee that stated "Bitch watch out your [sic] dead."[8]

Wife received an ex parte order of protection and Judge Stokes ordered Husband to appear and show cause why an order of protection should not issue. Wife thereafter served her ex parte order of protection on Husband's employer. This led Husband to file a petition for civil and criminal contempt, as well as further injunctive relief, alleging Wife violated the automatic injunction imposed pursuant to Tennessee Code Annotated section 36-4-106(d)(3) by harassing several FedEx employees and serving the ex parte order of protection on the airline's Pilots Association.[9] The trial court granted Husband's request for injunctive relief.

On June 7, 2006, Wife allegedly appeared before the Superior Court of San Mateo County to litigate the temporary restraining order and child custody order previously filed. It appeared to Husband that Wife would attempt once again to have Shelby County law enforcement execute the California order. Husband therefore filed an emergency petition to prevent Wife from contacting the children in any manner, removing the children from Husband, or removing the children from the jurisdiction. He also filed a petition for criminal contempt, citing Wife's willful disregard of the order prohibiting Wife from proceeding in the California court on any matter within the circuit court's jurisdiction. In addition, Husband filed an emergency petition to enjoin Wife from coming about Husband's residence, coming about any of the children's scheduled appointments, and communicating with Husband. The court granted Husband's request for injunctive relief and prohibited Wife, *inter alia*, from communicating with Husband.

Wife's inability to contact Husband did not prevent subsequent disputes from arising. On July 31, 2006, Wife filed a *pro se* petition for contempt alleging Husband willfully disregarded his obligation to pay Wife's credit card expenses as set forth in the March 10 consent order. She further submitted Husband violated a mandatory injunction prohibiting him from cancelling Wife's car

---

[8]The trial exhibits provide further insight on the alleged rape. Wife alleged Husband entered her hotel room through a window, tied her up, and raped her while holding his hand over her mouth. She believed Husband had an accomplice, stating an unidentified woman may have slipped something in Wife's drink when she picked up food at a local restaurant. The Rape Crises Center administered a rape kit, an investigation ensued, police interviewed Husband and took a DNA sample, but the Tennessee Bureau of Investigation ("TBI") found no evidence of Husband's semen. As a result, no criminal charges were filed.

[9]Tennessee Code Annotated section 36-4-106(d)(3) automatically imposes "[a]n injunction restraining both parties from harassing, threatening, assaulting or abusing the other and from making disparaging remarks about the other to or in the presence of any children of the parties or to either party's employer." Tenn. Code Ann. § 36-4-106(d)(3) (2010).

insurance.  Husband subsequently moved to sanction Wife under Rule 11.02 of the Tennessee Rules of Civil Procedure.  He also filed another petition for criminal contempt, this one concerning an alleged violation of the order prohibiting Wife from harassing FedEx employees.  Additionally, the GAL filed an emergency petition to prohibit Wife from posting photographs and information about the minor children on a blog entitled "Custody Battle in Memphis" airing her side of the continuing divorce dispute, which the trial court later granted.[10]  In light of the continued allegations made against both parties, the maternal grandparents also filed a petition for custody of the children.

Extensive litigation continued regarding these and other matters for several months.  In the meantime, several non-parties became embroiled in the dispute.  An employee of Baptist Memorial Hospital, for example, moved for a protective custody order to relieve her of any duty to testify regarding personal information and to require her to testify only in the judge's chambers without the parties present.  She asserted in her motion that Husband subpoenaed her to testify regarding her role at the hospital.  She thereafter received multiple threatening letters from Wife warning her not to testify in the divorce case.[11]  One of the letters reportedly stated: "This is your last warning, do not testify on September 11, 2006 or I be [sic] inventive on how I pour gasoline on you and light you on fire.  Stay out of my business.  No more warnings."  Wife, on the other hand, moved for an injunction prohibiting Husband's new girlfriend and her child from having any contact with the parties' minor children.  And she later filed a motion to "Determine Why Courts Believe the Children's Interest is Best Served by Not Having Contact With Asian Mother" in which she alleged a Memphis police officer told her if she did not "straighten out her eyes" she would never get her children back.  Additionally, Wife filed a motion against Husband's attorney alleging the attorney conspired with Husband to place Wife and her children under duress and force Wife to sign the March 10 consent order addressing custody.

The divorce became so contentious that one of the non-parties, The Exchange Club, declined to participate further in the case citing the conflict between Husband and Wife.[12]  The Exchange

---

[10]"Wife's Custody Battle in Memphis" blog states its purpose as follows:

THANK YOU FOR VISITING MY SITE.  I HAVE CREATED THIS SITE IN AN EFFORT TO ADDRESS THE RACISM AND INTERNAL CORRUPTION THAT STILL EXIST (sic) IN MEMPHIS, TENNESSEE.  IT IS 2006 YET **MEMPHIS** HAS BEEN IN A TIME WARP.  I AM AN ASIAN AMERICAN THAT HAS BEEN STRIPPRED (sic) OF HER CHILDREN BECAUSE OF THE COLOR OF MY SKIN AND THE SHAPE OF MY EYES.  I HAVE BEEN STABBED, RAPED, AND DOUSED IN GASOLINE BY MY HUSBAND, **SHEM MALMQUIST**, (IS CAUCASIAN) YET THE POLICE ARE UNWILLING TO CONDUCT AN INVESTIGATION.

[11]One of the trial exhibits suggests a handwriting expert determined Wife authored the threatening letter.

[12]This may have stemmed in part from Wife's allegation that an unidentified man approached her
(continued...)

Club explained to Wife by letter it had tried for several months to work with Wife regarding visitation, but it had become apparent that the Exchange Club could no longer accommodate her needs. The letter added that "it is evident that this case is placing excessive demand on our resources to effectively provide visitation resources to you." The Exchange Club further explained in a letter addressed to the GAL:

> The Exchange Club Family Center provides supervised visitation services in order to create an atmosphere where the emotional and physical well-being of children is fostered. We strive to assist parents in maintaining healthy relationships with their children in a non-conflict, neutral environment. As such, we reserve the right to determine whether or not we can adequately provide supervised visitation services when families are court ordered.
>
> . . . .
>
> As stated, our purpose in providing supervised visitation is to create an environment for parents to conduct themselves in a manner that clearly demonstrate [sic] that they are putting their own interests aside (which is often very hard to do) and focusing on establishing and maintaining a healthy, nurturing relationship with their children. The Malmquist case has consistently placed undue demand on our resources to effectively continue providing services, leading us to feel it necessary to terminate this case.

After the Exchange Club's withdrawal, the trial court ordered visitation at West Tennessee Family Solutions ("WTFS"). WTFS, however, also refused to further provide Wife services after a period due to "unanticipated contacts" to the agency from outside sources.

The parties' barrage of motions and petitions continued as the case trudged forward, many necessitated by Wife's previous *pro se* motion filings and her actions in filing additional lawsuits. Dorothy Pounders, for example, moved to withdraw as Husband's counsel because Wife filed a civil action in Shelby County General Sessions Court alleging "extortion, fraud, misrepresentation, [and] duress" against the law firm of Pounders Coleman and one of its associates. Husband's attorney explained she feared the firm's interests in defending the general sessions lawsuit might materially limit its ability to continue representation of Husband. The trial court eventually denied the motion to withdraw. Wife responded with separate motions to disqualify the GAL and to disqualify attorneys from the Pounders Coleman law firm.

Husband tried somewhat to stem the tide of litigation, petitioning for injunctive relief to prohibit Wife from filing any court actions against judges, the GAL, employees, courtroom

---

[12](...continued)
during her second visit at the Exchange Club and threw a liquid substance on her. The police and the Exchange Club's security team investigated the incident but no charges were ever filed.

personnel, Husband, Husband's counsel, Husband's employer, any witnesses, any family members, or any other persons associated with the case pending further orders of the court.[13]  Husband alleged Wife had pursued a pattern of abuse of process and the filing of frivolous complaints to intimidate witnesses, attorneys, and court personnel.  In addition to the complaint filed against Husband's attorney, he asserted Wife had filed administrative complaints against police officers and court personnel involved in the divorce case, an action against FedEx, and an action against his ex-wife and fourteen-year-old child in California.[14]  The excessive filing of motions and petitions continued unabated.  The release of the GAL's report became a highly disputed issue, entangling several additional non-parties in the conflict between Husband and Wife.  Issues of contempt remained a source of contest.  And Wife accused the GAL of misconduct, illegal activity, and violations of the ethical rules governing lawyers.

The trial court, much to its credit, managed to conduct a trial in April 2007.  The parties presented the live testimony of 30 witnesses, the deposition testimony of 1 witness, and 122 trial exhibits over several days.[15]  The live witnesses included Wife; Husband; Husband's second wife, Rebecca Malmquist; Dr. Fred Steinberg, PH.D; Dr. John Ciocca, PH.D; Dr. Neil Aranov, PH.D; Wife's sisters, Lisa and Elizabeth Nicolosi; Wife's father, Claudio Nicolosi; the guardian ad litem, Gina Higgins; and a forensic investigator with the TBI, Quadri Devnam.

As one might expect, Husband and Wife offered starkly contrasting testimony with respect to the altercations that arose during and after the marriage.  The GAL's testimony suggested, however, Wife was the primary cause of the problems concerning the children.  The GAL testified she investigated each and every allegation the parties made and found no evidence to support the allegation that Husband abused the children.  She further testified the unusual incidents which occurred throughout the proceedings ceased when Husband obtained custody of the children.

---

[13]The parties had previously entered into a consent order enjoining each of them from filing suits or charges, whether civil or criminal, against the other without receiving written permission from the court.

[14]One of the trial exhibits, for example, is a complaint for violation of civil rights, violation of federal consumer protection law, malicious harassment, outrageous conduct, malicious prosecution, defamation, and civil conspiracy.  Wife filed this complaint against the City of Memphis, Memphis Police Officer Michael Akin, individually and in his official capacity; Memphis Police Officer Melanie Howe, individually and in her official capacity; Bartlett Police Captain David Cupp, individually; City of Germantown; Germantown Police Captain Lee Covey, individually and in his official capacity; Germantown Police Detective W.E. Stemmler, individually and in his official capacity; Germantown Police Officer Cannon, individually and in his official capacity; Lisa Tucker Akin, individually and under apparent color of authority; Shem Malmquist; and John Doe 1-10.  Wife also filed an administrative complaint against Memphis Police Officer Michael Akin alleging he used department resources to supply his wife, private investigator Lisa Akin, information about Wife.  Officer Akin responded that he accessed the Memphis Police Department kiosk only due to constant threats and harassment by Wife.  He ultimately received a two-day suspension for violation of MPD regulations.

[15]Wife asserted at oral arguments the trial lasted fourteen days.

According to the GAL, the children appeared to be safe and fairly well-adjusted after residing with Husband for a period. She accordingly recommended the trial court name Husband the primary residential parent and continue the supervision of Wife's parenting time.

In addition, one of the several mental health professionals offered troubling testimony concerning Wife. Dr. Steinberg testified Wife yielded a clinically significant profile after administration of the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and the Rorschach Inkblot Technique. He explained that testing of Wife revealed an elevation on the paranoia scale and anti-social personality traits. He also described Wife's reality testing as poor. According to Dr. Steinberg, Wife evidenced bizarre-thinking, perceived herself as a victim of conspiratorial plots, and exhibited feelings of persecution. Dr. Steinberg testified this type of persecution mentality is a delusional disorder. He further testified that Wife received a Global Assessment of Function ("GAF") score of 50, which reflected a low level of functioning. Dr. Steinberg's report detailed his findings and added:

> It is significant that [Wife] yielded an abnormal MMPI-2 profile, considering the circumstances of the present evaluation. Most individuals are defensive and attempt to present themselves as normal, particularly when in the midst of a custody conflict. [Wife] was unable to do this within this present evaluation. She expressed serious psychopathology with indications within the data consistent with delusional thinking. The Rorschach indicated poor reality testing. These features are consistent with an individual who is unaware that her thoughts are aberrant.

> The Court will ultimately assess whether [Wife's] allegations have merit. It is very possible that she is issuing allegations which are either deceitful or delusional. These two possibilities do not have to be mutually exclusive. The psychological test data indicate the possible presence of a psychiatric disturbance that most fits the criteria of a Delusional Disorder and a personality disorder with antisocial and borderline features.

The other mental health professionals who examined the parties offered varying views. Wife's psychologist disputed the findings of Dr. Steinberg. Dr. Aranov described Dr. Steinberg's hand-scoring of Wife's MMPI-2 as fraught with error, adding that his testing of Wife revealed no significant elevations. Having treated Wife approximately 60 times, Dr. Aranov disagreed with the description of Wife as a "crazed" person. Dr. Ciocca likewise testified his testing of Wife did not reveal significant elevations but cautioned he did not complete his report because the parties' attorneys requested he go no further in his evaluation. Dr. Ciocca testified his findings may have changed had he completed the report.

A fourth psychologist, Dr. John Hutson, PH.D., evaluated the parties but did not testify at trial. Dr. Hutson reported in a letter to the GAL:

[Husband] was administered an MMPI-2 and a Millon Clinical Multiaxial Inventory-III on March 10, 2005 by Dr. John Ciocca. The testing had marginal validity because he attempted to place himself in an overly positive light by minimizing his faults and denying his problems. He is not very introspective or insightful about his own behavior. He is not particularly open to psychological self-evaluation and is somewhat rigid and inflexible in his approach to problems. [Husband] appears to have good social skills and has little difficulty interacting with others. He does not appear to be overly anxious or prone to develop unrealistic fears. Under conditions of stress, however, he has a tendency to develop physical problems and has difficulty openly expressing anger. He is likely to be seen as somewhat conventional and not assertive but self-centered and attention seeking. He has a strong need for affection from others. His sociability may be somewhat superficial and mask an overlying irritability and arrogance. Diagnostically, he shows evidence of histrionic personality traits and some narcissistic characteristics.

. . . .

[Wife] was administered an MMPI-2 on March 10 and a Millon on March 11 by Dr. Ciocca. There was a considerable amount of similarity in the results in her testing with those of her husband. She also responded in a rather defensive manner, attempting to project a favorable self-image. She has a very high need to be seen in a positive light, is rather inflexible and unrealistic, and has an exaggerated sense of personal virtue. Like her husband, she is also rather naive and uninsightful about her psychological functioning. She seems to have a tendency to blame others, to be irritable, and to be argumentative. This tends to cause problems in relationships and her high degree of interpersonal hypersensitivity can lead to periods of instability when stressed. She also is outgoing and sociable with a strong need to be around others. The results, however, do show that she is more prone to violent behavior when angry. On the Millon, she shows evidence of obsessive compulsive disorder. However, her next three highest scores, all of which are significant, nearly mirror her husband's and include desirability, histrionic and narcissistic traits.

. . . .

. . . . Given their level of education, intelligence, and age, one has to wonder how two children came to be born in such a brief period of time into a relationship with virtually no stability. Both parents are seen as rather emotionally needy, self-centered, and socially shallow. The one strength that [Husband] brings is that he has built a successful career over a significant period of time which has required him to be emotionally stable and free of any substance abuse problems. He obviously works in a closely supervised environment where any problems would be difficult to conceal. [Wife], on the other hand, seems to have a very warm and supportive family; however, by their own admission, they know little about her, especially from the time

she left the University of California Berkeley until the present day. The trial court ultimately resolved the theories set forth in the conflicting expert proof in favor of Dr. Steinberg.

On July 11, 2007, the trial court entered a final decree of divorce which contained several findings relevant to this appeal.[16] First, the court found each party engaged in conduct warranting the grant of a divorce against the other and declared the parties divorced pursuant to Tennessee Code Annotated section 36-4-129(b). Second, the court named Husband the primary residential parent. The court continued supervision of Wife's parenting time, awarding her parenting time twice a week for up to four hours per session and additional time on holidays. Third, the court determined the 401k benefits Husband accrued during the marriage represented the only marital property subject to equitable distribution, which the court divided evenly between the parties. Fourth, the court awarded Wife transitional alimony for four months in the amount of $2,500, rejecting her request for attorney's fees. Fifth, the court ordered each party to pay a portion of the GAL's fees, deemed those fees child support, and placed a lien on Wife's portion of Husband's 401k benefits to ensure payment. Sixth, the court dismissed Husband's petition for contempt, finding Wife had not willfully failed to pay child support. Finally, the court permanently enjoined each party from coming around the other except for child visitation purposes or court proceedings. Wife timely appealed.[17]

The trial court's resolution of the substantive issues between the parties did not slow the pace of litigation. Wife's initial post-trial filings included a Rule 60 motion for recusal, relief from judgment, and new trial; an emergency petition for injunctive relief to prohibit Husband's fourth wife from spending time unsupervised with the children pending a psychological evaluation; a second motion for recusal; a motion to disqualify the GAL; and a motion for sanctions against Pounders Coleman. Pertinent to this appeal, Wife filed a motion to compel the court reporter to produce a copy of duplicate tapes of the trial proceedings, which the parties later dismissed by consent. Wife explained in her papers before the trial court and this Court that a dispute arose between her and the court reporter over the cost of the transcript. Wife apparently filed suit against the court reporter for breach of contract in the Shelby County General Sessions Court. The transcript nevertheless remained unavailable to this Court for the purposes of appeal. Husband filed motions of his own, including a motion to dismiss the appeal for failure to timely file the trial transcript. This Court denied Husband's motion to dismiss and remanded for consideration of Wife's Rule 60 motion.

---

[16]The court also entered an order on the petitions for dependency and neglect finding Husband and the GAL did not clearly and convincingly prove the allegations of their petitions. Neither party challenges the court's ruling on dependency and neglect.

[17]The trial court's final decree ordered the parties to prepare a permanent parenting plan and child support worksheet based upon its findings. The parties filed and the court approved the parenting plan and child support worksheet on December 14, 2007.

On remand, the trial court entered an order denying Wife's motion for Rule 60 relief. Wife subsequently filed the trial court's order, a statement of the evidence, and a notice of the current unavailability of the trial transcript with this Court. We responded with an order requiring Wife to file her statement of the evidence with the trial court pursuant to Rule 24 of the Tennessee Rules of Appellate Procedure. Husband thereafter renewed his motion to dismiss the appeal for failure to file a transcript, which led this Court to remand the case once again to the trial court for approval of the record and authentication of the exhibits. This Court in its discretion permitted the late filing of a transcript through March 9, 2009, but required Wife to submit a statement of the evidence if the transcript remained unavailable.

Wife filed a portion of the purported trial transcript on remand. Although Wife did not procure a transcript from the court reporter, she did receive a copy of the tape recordings. It appears Wife copied, reviewed, and transcribed these tapes. She later filed her transcript and statement of the evidence with the trial court. Husband responded with a detailed objection to Wife's filing and her statement of the evidence. He asserted the transcript contained numerous errors including the attribution of testimony to incorrect or unnamed witnesses. He added that Wife entered only a portion of the transcript that was available from the audio recordings, excluding much of the testimony favorable to Husband. Additionally, he stated Wife repeated portions of the transcript and placed them out of context. The trial court agreed with Husband and filed an order titled "Non Certification of the Record" refusing to certify the purported transcript as a fair and accurate account of the proceedings before the court. The court instead prepared and filed its own statement of the evidence.

Nearly a year-and-a-half after Wife filed a notice of appeal, the briefing stage of this appeal began. The onslaught of filings continued. The parties filed motions regarding the integrity of the record, a motion to remand, and a motion for consideration of post-trial facts. The parties filed numerous motions and responses related to extension of the briefing schedule. Wife moved to strike Husband's brief. The parties filed multiple motions to continue oral arguments. Husband filed multiple notices alleging he had not received Wife's appellate filings. Husband filed a motion to require the appellate court clerk to forward copies of Wife's pleadings to Husband. Wife moved to vacate an order of the trial court. Wife moved to reconsider correcting the record. Husband filed a notice of bankruptcy.[18] Wife moved to stay the appeal. Many of these filings eclipsed 30 pages including attachments. Most filings generated a response. Many responses gave rise to a reply. And this Court diligently proceeded to respond to each filing by order. The parties, both *pro se*, finally appeared before this Court for oral arguments in October 2010.[19]

Having determined there is no remaining impediment to our review, we now turn to the

---

[18]Husband later filed notice with this Court demonstrating he dismissed his bankruptcy petition.

[19]Wife raised a number of arguments during oral arguments that she did not raise in her brief, relying on facts which find no support in the record. We explained at that time our review is limited to the record before us, which we reiterate here.

issues presented in the parties' briefs.[20]

## II. Issues Presented

Wife raises the following issues, as we perceive them, for review:

(1)     Whether this Court must dismiss this appeal for lack of a final judgment;

(2)     Whether the appellate record is so corrupt due to no fault of Wife that we must remand for correction;

(3)     Whether the trial court abused its discretion during the allocation of parental responsibility;

(4)     Whether the trial court abused its discretion during the classification and division of marital property;

(5)     Whether the trial court abused its discretion when it awarded short-term, transitional alimony to Wife;

(6)     Whether the trial court abused its discretion when it ordered the parties to pay their own attorney's fees; and

(7)     Whether the trial court abused its discretion when it ordered Wife to pay a portion of the guardian ad litem fees.

Wife also presents issues on whether the trial court erred in imputing income to Wife, whether the trial court erred when it deemed its award of guardian ad litem fees as child support, and whether the trial court erred when it placed a lien on Wife's portion of Husband's 401k to secure Wife's payment of the guardian ad litem fees. Wife, however, offers at best skeletal arguments on these issues supported by insufficient citation to legal authority or the record. These arguments are

_____

[20]Although we denied Wife's motion to stay, we briefly delayed deciding this appeal while attempting to verify whether Wife's argument in another appeal might affect the validity of the statement of the evidence. Wife asserted in her motion that a separate appeal concerning Judge Stokes's decision not to recuse himself following his purported receipt of a death threat might void the statement of the evidence. Out of an abundance of caution, we waited until the filing of Wife's brief in the aforementioned appeal to determine whether she offered any argument in those proceedings that might affect our ability to rely on the current statement of the evidence. We are satisfied she offered none. We further note she did not raise the issue of recusal in this appeal or file a motion for consideration of post-judgement facts related to the alleged death threat.

therefore waived.[21]  *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a), (b); *Bean v. Bean,* 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000) (citations omitted).

### III.  Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record with a presumption of correctness.  Tenn. R. App. P. 13(d).  We will reverse a trial court's factual finding only if the evidence preponderates against it.  *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000) (citation omitted).  The evidence will preponderate against a trial court's factual finding if the record supports another finding of fact with greater convincing evidence.  *Mosley v. McCanless*, 207 S.W.3d 247, 251 (Tenn. Ct. App. 2006) (citations omitted).  Factual findings based on the trial court's assessment of witness credibility receive a higher degree of deference.  *See Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (citations omitted) (citation omitted).  We will overturn factual findings that hinge on the credibility of the witnesses only if clear and convincing evidence demonstrates error in the court's conclusion.  *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).  We review the trial court's resolution of legal questions *de novo* with no presumption of correctness.  *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

As we will explain herein, this Court reviews most issues decided in a divorce dispute for an abuse of discretion.  A trial court abuses its discretion if it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous evaluation of the evidence.  *Elliott v. Cobb*, 320 S.W.3d 246, 249-50 (Tenn. 2010) (citation omitted).  A trial court also abuses its discretion if it strays beyond the applicable legal standards or when it fails to properly consider the factors that customarily guide a discretionary decision.  *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citation omitted).  The abuse of discretion standard does not permit this Court to second-guess the lower court's judgment or merely substitute an alternative we prefer.  *Id.* (citations omitted).  We must instead affirm the discretionary decision so long as reasonable legal minds can disagree about its correctness.  *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

---

[21]We state once again litigants cannot expect this Court to do their work for them.  *Bean v. Bean,* 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000) (citations omitted).  "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her. . . ."  *Sneed v. Bd. of Pro'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010).  The adversarial system of justice is premised on the idea that "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."  *State v. Northern*, 262 S.W.3d 741, 767 (Tenn. 2008) (Holder, J., concurring in part and dissenting in part) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)) (internal quotation marks omitted).  Thus, "where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."  *Sneed*, 301 S.W.3d at 615.

## IV. Analysis

This is not a complicated divorce case.[22] It concerns a short-term marriage, two children, and one marital asset. As Wife concedes in her brief, this dispute "quickly became more about the divorce process itself than the marriage." Scandalous accusations arose. Mysterious threats were levied. DCS intervened. Numerous petitions, complaints, and motions were lodged. Substantial attorney's fees and guardian ad litem fees were incurred. Numerous non-parties found themselves, willingly and unwillingly, at the center of a mounting storm. The result is a case that Wife candidly describes as "bizarre in its procedural history" and a trial record that spans thirty-five volumes excluding a verbatim transcript of the lengthy trial.

As in prior cases, the parties disagree about "[j]ust how this case was derailed into such malevolence and expense." *Andrews v. Andrews*, W2009-00161-COA-R3-CV, 2010 WL 3398826, at *11 (Tenn. Ct. App. Aug. 31, 2010) (quoting the trial court) (internal quotation marks omitted), *perm. app. denied* (Tenn. March 9, 2011). One might argue the tortuous history of this case is yet another "mark of the failure of the legal system to effectively deal with and minimize the emotional and financial conflicts inherent in ending . . . marriage." *Id.* (quoting the trial court) (internal quotation marks omitted). For our part, we will not entertain Wife's request to further delay resolution of this case. We will instead use the tools at our disposal to provide the parties some sense of finality.

### A. Final Judgment

The first question before this Court is whether we must dismiss this appeal for lack of subject matter jurisdiction. This Court's subject matter jurisdiction is limited to final judgments except where otherwise provided by procedural rule or statute. *Bayberry Assocs. v. Jones,* 783 S.W.2d 553, 559 (Tenn. 1990) (citing *Aetna Cas. & Sur. Co. v. Miller,* 491 S.W.2d 85, 86 (Tenn. 1973)). Rule 3(a) of the Tennessee Rules of Appellate Procedure provides:

> In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right. Except as otherwise permitted in rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure, if multiple parties or multiple claims for relief are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of all parties.

Tenn. R. App. P. 3(a). Because the trial court did not certify the final decree as final pursuant to Rule 54.02, the court's order is appealable as a matter of right only if it resolves all the claims rights,

---

[22]We do not downplay the competing allegations of verbal and physical abuse in the parties' pleadings. Such allegations, however, are sadly not uncommon in divorce cases.

and liabilities of the parties.

Wife contends the final decree of divorce in this case, which she appealed, is not a final judgment because the trial court did not adjudicate two separate petitions for contempt she filed in 2006. We agree the cited petitions appear to remain unresolved. It also appears to this Court that three additional petitions for contempt filed in 2005 remain unresolved. While these petitions may have been previously dismissed or adjudicated as Husband suggests, the record before us does not demonstrate the parties or the trial court resolved these matters prior to the entry of the court's final decree of divorce. The trial court's final decree is therefore not a Rule 3(a) final judgment because it does not resolve all the claims, rights, and liabilities of the parties. *See Davis v. Davis*, 224 S.W.3d 165, 168 (Tenn. Ct. App. 2006).

The absence of a final judgment poses a problem. We typically dismiss appeals from non-final judgments for lack of subject matter jurisdiction. This Court has, however, exercised jurisdiction over non-final judgments under the authority of Rule 2 of the Tennessee Rules of Appellate Procedure. Rule 2 states:

> For good cause, *including the interest of expediting decision upon any matter*, the Supreme Court, Court of Appeals, or Court of Criminal Appeals may suspend the requirements or provisions of any of these rules in a particular case on motion of a party or on its motion and may order proceedings in accordance with its discretion, except that this rule shall not permit the extension of time for filing a notice of appeal prescribed in Rule 4, an application for permission to appeal to the Supreme Court from the denial of an application for interlocutory appeal by an intermediate appellate court prescribed in Rule 9(c), an application for permission to appeal to the Supreme Court from an intermediate appellate court's denial of an extraordinary appeal prescribed in Rule 10(b), an application for permission to appeal prescribed in Rule 11, or a petition for review prescribed in Rule 12.

Tenn. R. App. P. 2 (emphasis added). Our supreme court has interpreted Rule 2 to permit suspension of Rule 3(a) for good cause. *Bayberry*, 783 S.W.2d at 559.

This Court exercised its authority to suspend Rule 3(a) in *Ruff v. Raleigh Assembly of God Church, Inc.*, W2001-02578-COA-R3CV, 2003 WL 21729442 (Tenn. Ct. App. July 14, 2003), *perm. app. denied* (Tenn. Jan. 5, 2004). We explained:

> In order to suspend the requirements of Rule 3(a), this Court must affirmatively show that the rule is suspended and must give a "good reason" for the suspension. *See Bayberry Assocs.,* 783 S.W.2d at 559; *see also* Tenn. R. App. P. 2. The stated purpose behind Rule 2 is to empower the courts "to relieve litigants of the consequences of noncompliance with the rules in those circumstances in which it is appropriate to do so." Tenn. R. App. P. 2 (advisory commission comment).

*Ruff*, 2003 WL 21729442, at \*5. In *Ruff*, we found it appropriate to relieve the appellant of noncompliance with Rule 3(a) in an appeal "with a tortured history" where the parties had been entangled in court proceedings for over ten years. *Id.* We reasoned suspension of Rule 3(a) was appropriate under the facts because the parties deserved some form of closure. *Id.*

The parties in this hotly contested divorce case equally deserve closure. The principal impediment to both parties moving on from their unsuccessful experiment as a married couple is the pending divorce dispute. It is clear the issues pending before this Court will remain highly disputed until final resolution of this case. It is also evident these parties will litigate any and all potential sources of dispute arising in this or related cases so long as this case is pending. Although we do not favor the suspension of Rule 3(a), remanding this case to the trial court to resolve the aforementioned petitions for contempt would not facilitate review of the issues before us. It would only cause further strife and delay. We therefore find good reason to suspend the requirements of Rule 3(a) and exercise jurisdiction over this appeal.

### B.  Record on Appeal

The next question before this Court is whether the record on appeal is so "corrupt" as to preclude meaningful review of the trial court's decision. Wife argues the appellate record is both inadequate and incapable of correction despite her best attempts to prepare an accurate record. She contends the trial court and the court clerk have submitted an incomplete and corrupt record where: (1) the trial court did not authenticate any of the exhibits included in the record, (2) the record contains several large notebooks titled "Shem Malmquist Exhibits" that were not before the court at trial, (3) the record excludes at least one trial exhibit, (4) the court clerk did not include the record from the dependency and neglect proceedings, (5) the court clerk did not include filings related to an order of protection, and (6) the trial court's statement of the evidence excluded the testimony of thirteen witnesses. She contends remand is necessary as a matter of due process because she had no hand in creating the numerous deficiencies which prevent full and fair review. In addition to remand, Wife asks this Court to order supplementation of the statement of the evidence through either the admission of the trial transcript or the re-taking of the testimony in open court.

Wife stands in a difficult position because it is first and foremost the appellant's duty to provide a record that allows meaningful appellate review. *Marra v. Bank of New York*, 310 S.W.3d 329, 335 (Tenn. Ct. App. 2009) (citing Tenn. R. App. P. 24(b); *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989)). "The burden is upon the appellant to show that the evidence preponderates against the judgment of the trial court." *Outdoor Mgmt., LLC v. Thomas*, 249 S.W.3d 368, 377-78 (Tenn. Ct. App. 2007) (citing *Capital City Bank v. Baker*, 442 S.W.2d 259, 266 (Tenn. Ct. App. 1969)). "The burden is likewise on the appellant to provide the Court with a transcript of the evidence or a statement of the evidence from which this Court can determine if the evidence does preponderate for or against the findings of the trial court." *Id.* at 378. "The result is generally that where factual issues are raised, without an appellate record containing the facts, this court cannot perform a *de novo* review or determine the preponderance of the evidence." *Tarpley v. Hornyak*, 174 S.W.3d 736, 740 (Tenn. Ct. App. 2004) (citing *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App.

1992)). "Therefore, in such cases, we usually assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings." *Id.* (citations omitted).

We find no reason to depart from the traditional rules placing the duty to provide a sufficient record on the appellant. Any deficiency in Wife's position on appeal resulting from the abridged account of a very lengthy trial is attributable to her. The sole reason we are without a full and complete transcript of the trial proceedings is because Wife declined to procure it. The only reason the statement of the evidence does not include a more extensive recitation of testimony allegedly favorable to Wife is because she did not provide the trial court with a fair, accurate, and complete account of the proceedings. Wife must now reap what she has sowed. It would create a perverse incentive to remand for further proceedings, including the retaking of evidence, where the sole impediment to unabridged review of the first trial—one producing an unfavorable result from Wife's perspective—is Wife's refusal to procure the transcript admittedly available to her.

We further conclude none of the alleged deficiencies in the record affect our ability to evaluate the trial court's decision. Wife has not shown that inclusion of the notebooks titled "Shem Malmquist Exhibits," the alleged removal of at least one trial exhibit, the absence of the record from the dependency and neglect proceedings, or the alleged failure to include filings related to an order of protection will impact our decision in any way. The notebooks are easily ignored even if we assume they were improperly included. The record from the dependency and neglect hearing is irrelevant with respect to the issues before us. Wife provides no indication of what the alleged missing exhibit—Volume 43 of the record designates a handwritten note marked "Emails" as exhibit #103—would demonstrate, who presented the exhibit, or how it would alter this Court's review.[23]

---

[23]Wife asserted at oral arguments the missing exhibit contained exchanges between her and the GAL which she alleged demonstrated the racial bias of the GAL. Wife, however, has provided this Court no basis upon which to determine whether her assertion is true. The record nevertheless contains other trial exhibits allegedly demonstrating the racial bias of the GAL. One exhibit, which purports to be from the Germantown Police Department, contains a mugshot of Wife and states:

> THIS ASIAN WOMAN IS DANGEROUS AND HAS A HISTORY OF CRIMINAL ACTIVITY. LIKE MOST ASIANS WE WANT TO REMOVE THIS [sic] HER FROM TENNESSEE INTO A MENTAL INSTITUTION OR PRISION [sic]. ACCORDING TO DR. HUTSON AND DR. STEINBERG MS. NICOLOSI HAS AN ANTI-SOCIAL DISORDER AND PSYCHOPATHIC TENDENCIES (SOCIOPATH). DUE TO MS. NICOLOSI [sic] UNSTABLE BEHAVIOR SHE IS NOT ALLOWED ANY CONTACT WITH HER CHILDREN. THE CHILDRENS [sic] ATTORNEY, GINA HIGGINS IS ASSISTING US MAKING SURE THAT MS. NICOLOSI WILL NEVER BE ALLOWED TO SEE OR HARM THESE CHILDREN AGAIN. IF YOU HAVE ANY INFORMATION OR NEED CLARIFICATION ABOUT MS. NICOLOSI CALL LT. MELONIE HOWE AT THE MEMPHIS POLICE DEPARTMENT. 901-373-3883.

(continued...)

The same is true for the papers related to an order of protection allegedly not included in the record. Of course, we could review Wife's contentions in greater detail had Wife provided the trial transcript for our review. She did not, and we are without good reason to further delay the resolution of this case.

We reject the suggestion that the trial court's statement of the evidence does not provide a satisfactorily fair, accurate, and complete account of the trial because the court did not recount all of the testimony of witnesses purportedly favorable to Wife. Rule 24 of the Tennessee Rules of Appellate Procedure governs the filing of a statement of the evidence where the transcript is unavailable. It states, in pertinent part:

> (c) Statement of the Evidence When No Report, Recital, or Transcript Is Available. If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal. Upon filing the statement, the appellant shall

---

[23](...continued)
A second exhibit—an unsigned, typewritten letter purportedly from Husband's private investigator to the Tennessee Department of Commerce and Insurance—contains similar language:

> I am attaching some additional information about Danielle Nicolosi Malmquist. Mrs. Gina Higgins, assigned to the Malmquist children [sic] case has recently provided me with some additional reports that will assist you in seeing that Ms. Malmquist is not a stable person. Ms. Higgins indicates that Ms. Malmquist [sic] Asian ways have lead [sic] her to be driven out of Shelby County and her children [sic]. . . . Ms. Malmquist was determined to be a psychopath by several court appointed psychologist [sic] that are involved in this case. I have spoken with the GAL on several occasions and she is of the same opinion that I am about the children's safety being at risk around Ms. Malmquist. Ms. Higgins believes that Ms. Malmquist [sic] unstable Asian Culture leads her to be a risk around her children. The oriental couple, He's, who recently caused many problems in Shelby County used their child to escape deportation. Hopefully soon Ms. Malmquist will be deported out.

To say the least, the authenticity of these exhibits was a source of dispute. Their inclusion in the record nevertheless demonstrates the trial court had before it evidence purportedly showing the bias of the GAL due to Wife's race. Additionally, the trial court specifically noted Wife's testimony that the GAL was biased against Asian-Americans. The trial court's final decree impliedly rejected the assertion of bias, the credibility of Wife, and the reliability of her trial exhibits. It is therefore inconceivable that the missing exhibit, even if we assume it is not a stack of emails provided elsewhere in the record, would unravel the basis for the trial court's decision. We also note Wife asserted at oral arguments—but not in her appellate brief—that Exhibits #65, #91, and #92 were missing from the record. This statement was demonstrably false.

simultaneously serve notice of the filing on the appellee, accompanied by a short and plain declaration of the issues the appellant intends to present on appeal. Proof of service shall be filed with the clerk of the trial court with the filing of the statement. If the appellee has objections to the statement as filed, the appellee shall file objections thereto with the clerk of the trial court within fifteen days after service of the declaration and notice of the filing of the statement. Any differences regarding the statement shall be settled as set forth in subdivision (e) of this rule.

. . . .

(e) Correction or Modification of the Record. If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth. Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. *Absent extraordinary circumstances, the determination of the trial court is conclusive.* If necessary, the appellate or trial court may direct that a supplemental record be certified and transmitted.

Tenn. R. App. P. 24(c), (e) (emphasis added).

The trial court's decision to enter its own statement of the evidence amounted to an implied recognition that Wife's statement of the evidence did not fairly portray the events at trial. Although the trial court recited the relevant testimony of some of Wife's witnesses, its decision to exclude a recitation of testimony by others might indicate a number of things. It might indicate the trial court found such testimony was unnecessary to provide a fair, accurate, and complete account of what transpired with respect to the issues serving as the bases of this appeal. It might indicate the trial court found such testimony not credible or wholly irrelevant. Or it might simply indicate the trial court had an insufficient basis upon which to recount accurately the testimony of these witnesses. In any event, we conclude the trial court fulfilled its duty under the unique circumstances of this case and find its determination conclusive. The alternative, in our view, is to conclude Wife did not provide a sufficient record for review and summarily affirm the trial court's decision. We instead choose to review the case on its merits. We also find good reason under the facts to suspend the requirements of Rule 24 to the extent, if any, the trial court's statement of the evidence provides an incomplete account of the events before it because the court did not recount the testimony of all 30 witnesses who testified.

Finally, Wife's contention regarding the trial court's alleged failure to authenticate the trial exhibits does not persuade us she is entitled to remand. Rule 24 of the Tennessee Rules of Appellate Procedure provides, in pertinent part:

(f) Approval of the Record by Trial Judge or Chancellor. The trial judge shall approve the transcript or statement of the evidence and shall authenticate the exhibits

as soon as practicable after the filing thereof or after the expiration of the 15-day period for objections by appellee, as the case may be, but in all events within 30 days after the expiration of said period for filing objections. Otherwise the transcript or statement of the evidence and the exhibits shall be deemed to have been approved and shall be so considered by the appellate court, except in cases where such approval did not occur by reason of the death or inability to act of the trial judge.

Tenn. R. App. P. 24(f). Contrary to an assertion in Wife's brief, the court clerk filed numerous volumes of exhibits individually and collectively stamped "Filed Jun 01 2009 Clerk of the Courts" after the court considered Wife's statement of the evidence and Husband's objection thereto. The court thereafter filed an order in June 2006, entered *nunc pro tunc* to April 17, 2006, decertifying the partial transcripts Wife filed. Importantly, the order submitted for review on appeal the court's previous statement of the evidence "along with the exhibits which were authenticated by this [c]ourt and hereby made part of the record." We therefore disagree the trial court failed to authenticate the exhibits in the record. Also, we again find good reason to excuse any technical noncompliance, if any, with the mandates of Rule 24, noting Wife does not question the validity of the trial exhibits in the record. We decline to remand this case and conclude the record provides a satisfactory basis for review.

### C. Allocation of Parental Responsibility

The next issue before this Court is whether the trial court abused its discretion when it allocated parental responsibility for the parties' two children. The allocation of parental responsibility is one of the most important decisions confronting the courts. *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citation omitted). The overriding goal of a trial court is to approve a parenting plan that promotes the best interests and welfare of the child, regardless of the parents' interests in the resulting parenting arrangement. *Burden v. Burden*, 250 S.W.3d 899, 909 (Tenn. Ct. App. 2007) (citation omitted). "[I]n fact, *the interests of the parents are secondary to those of the children.*" *Id.* (quoting *Adelsperger v. Adelsperger,* 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)) (emphasis in original) (internal quotation marks omitted).

"No hard and fast rules exist for determining which [parenting] arrangement will best serve a child's needs; inquiry is factually driven and requires courts to carefully weigh numerous considerations." *Hogue v. Hogue*, 147 S.W.3d 245, 251 (Tenn. Ct. App. 2004) (citing *Gaskill v. Gaskill,* 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996)). Courts favor the right of the alternative residential parent to reasonable parenting time. *See Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted). Courts, however, may limit or eliminate a parent's unsupervised parenting time if there is definite evidence to show the exercise of that right would jeopardize the child. *See id.* (citations omitted) (internal quotation marks omitted). The best interests and welfare of a child may require the trial court to place limitations on the parenting time of either or both of the parents. *Hogue*, 147 S.W.3d at 251 (citing *D v. K,* 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995)).

"In choosing which parent to designate as the primary residential parent for the child, the

court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Ellis*, 211 S.W.3d at 286 (citing *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn.1983)). "In engaging in this analysis, the court must consider the factors set out in Tennessee Code Annotated § 36-6-106(a)." *Id.* (footnote omitted). Trial courts have broad discretion when allocating parental responsibility, but their determinations "must be based on the proof at trial and the applicable principles of law." *Id.* (citation omitted). "The decision frequently hinges on the credibility of the witnesses at trial, a matter that is within the sound discretion of the trial court; consequently, appellate courts are loathe to second-guess a trial court's conclusion." *Id.* at 286-87 (citations omitted).

Appellate courts review a trial court's allocation of parental responsibility for an abuse of discretion. *See Fulbright v. Fulbright*, 64 S.W.3d 359, 365 (Tenn. Ct. App. 2001) (citation omitted). It is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court. *See Eldridge*, 42 S.W.3d at 88. As our supreme court has explained,

> When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving [parental responsibilities], to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See State v. Franklin,* 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf. State v. Pappas,* 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); *Bradford v. Bradford,* 51 Tenn. App. 101, 364 S.W.2d 509, 512-13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See, e.g., State ex. rel Vaughn v. Kaatrude,* 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

*Id.* The trial court's discretion, however, is not unbounded. *Hogue*, 147 S.W.3d at 251 (citation omitted). The court must base its decision upon proof and apply the appropriate legal principles. *Id.* (citation omitted).

The General Assembly has codified two lists of factors courts must consider before allocating parental rights and responsibilities in a divorce case.[24] *See* Tenn. Code Ann. § 36-6-106(a) (2010);

---

[24]The existence of two separate statutory frameworks that expressly apply when allocating custody

(continued...)

Tenn. Code Ann. § 36-6-404(b) (2010). Tennessee Code Annotated section 36-6-106(a) requires a trial court to determine custody on the basis of the child's best interests and "consider all relevant factors, including the following, where applicable":

        (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

        (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

        (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

        (4) The stability of the family unit of the parents or caregivers;

        (5) The mental and physical health of the parents or caregivers;

        (6) The home, school and community record of the child;

        (7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

        (B) The court may hear the preference of a younger child on request. The

---

[24](...continued)
and/or parental responsibility in a divorce case creates room for confusion on precisely how courts should go about deciding such issues and how best to describe the results they reach. The terms "custody" and "visitation" found in Tennessee Code Annotated section 36-6-101 *et seq.*, while not entirely obsolete, are outmoded when considering a determination of parental responsibility under Tennessee Code Annotated section 36-6-401 *et seq.,* which was adopted in part to change the language of child custody decisions. *See* Janet Leach Richards, *Richards on Tennessee Family Law,* § 8-2(e) (3d ed. 2008) (footnotes omitted). Judge Don. R. Ash, one of the leading proponents of reform, explains the need to recast the terminology of custody decisions: "The archaic terms 'custody' and 'visitation' convey ownership over the child and imply that one party is merely a visitor in the home. These terms should be replaced with more user-friendly words." Judge Don R. Ash, *Bridge Over Trouble Water: Changing the Custody Law in Tennessee,* 27 U. Mem. L. Rev. 769, 801 (2007) (footnote omitted). The parenting plan statute did just that, replacing the traditional concepts of joint legal and physical custody with a new concept: the residential parenting schedule. 19A W. Walton Garrett, *Tennessee Practice Series: Tennessee Divorce, Alimony and Child Custody* § 26:3, at 78 (2d rev. ed. 2007). As a result, traditional terms such as custody, visitation, custodial parent, and noncustodial parent have given way to new terms, *e.g.*, "residential schedule, temporary and permanent parenting plans, primary residential parent, alternate residential parent, and parenting responsibilities." Richards, *supra*, at § 8-2(e) (footnotes omitted). The Code nevertheless harbors remnants of the old regime which are equally applicable to the decision of parenting issues before us. Because the change in terminology incorporated into the parenting plan statute was intended to inspire parties to move beyond the win-lose mentality present in previous disputes over parental responsibility, *see id.*, it is unclear why the legislature has not revised other statutory provisions to incorporate similar terms. We have attempted in this opinion to recast the issues presented in the more user-friendly language.

preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a).

Tennessee Code Annotated section 36-6-404 requires courts to establish a permanent parenting plan in divorce cases. Tenn. Code Ann. § 36-6-404(a). The permanent parenting plan must set forth a residential schedule in consideration of the following factors:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-404(b)(1)–(16).

The trial court expressly relied on Tennessee Code Annotated sections 36-6-106(a) and -404(b) when allocating parental responsibility in this case. Most of the relevant statutory factors favored Husband. The court found Husband served as primary caregiver to the children from December 2005 forward; Husband provided continuity and stability in the children's life; Husband exhibited a willingness to foster future good relations with Wife and believed the children should have a close relationship with Wife; Husband tested reasonably well on the psychological examinations and had the financial wherewithal to care for the children; Husband maintained a flexible work schedule, allowing him to work many days out of the home while the children were with him;[25] no agency assigned to investigate the numerous serious allegations against Husband with respect to the children found evidence of any intentional or accidental wrongdoings; and the Tennessee Bureau of Investigation found insufficient evidence to charge Husband in the alleged rape of Wife.

Many of these factors, on the other hand, weighed against Wife's position. The trial court found Wife visited the children inconsistently, demonstrated an unstable environment, and did not facilitate a close and continuing relationship between the children and Husband. Although Wife

---

[25]Husband explained at trial he works mainly from home arranging and monitoring flights worldwide.

asserted the cost of visitation as a concern, the court noted Wife visited her psychologist at least 60 times during the same period but visited her children less than half that number. Further, Wife continued to register economic complaints even after the trial court ordered Husband to pay half of the hourly fee, visiting the children only twice between September 2006 and February 2007. Additionally, the court found Wife initiated efforts to take the children back to California under the guise of a California custody order at a time when the court had full jurisdiction of the divorce matter and the dependency and neglect case.

The court further found Wife did not fare particularly well on the psychological examinations. The court recognized Wife received multiple mental health evaluations but emphasized the findings of Dr. Steinberg. The Court relied on Dr. Steinberg's findings that Wife revealed traits that bordered on delusional, showed tendencies to portray herself as a constant victim, and showed prosecutorial tendencies. Dr. Steinberg explained his reference to prosecutorial tendencies as describing a person who accuses and blames others coupled with bizarreness consistent with paranoid thinking. The court also placed reliance on Dr. Steinberg's testimony that Wife's GAF score of 50 reflected a person with a low level of functioning, giving cause for concern. The court added, "Wife will not seek to bring closure to this seemingly endless litigation, despite her own treating psychologist's advice to bring an end to this litigation, which he states is the major source of her mental anxiety." Finally, the court emphasized that Wife frequently received treatment by multiple psychologists and psychiatrists and was taking several mood-altering medications at the time of the trial.

Not all factors favored Husband over Wife. The court found, for example, both parties demonstrated affection for the children and the children had strong attachments to both parents. The court also found no evidence that any person who resided in or frequented either party's home posed a threat of potential harm to the children. Additionally, the court found no evidence to show the numerous allegations concerning abuse of the children made throughout this case were credible or that the children suffered from any of these alleged events. The court weighed these and other factors before concluding in its discretion that Husband would serve as primary residential parent of the parties' children and Wife would receive supervised visitation.

Wife argues the trial court abused its discretion when allocating parental responsibility. She asserts the court placed too much emphasis on Dr. Steinberg's report and testimony, arguing the court should have given more weight to the findings of Drs. Hutson, Ciocca, and Aranov. She further argues the trial court relied too heavily on the continuity of placement, Husband's income, and Wife's lack of visitation as factors supporting Husband. According to Wife, much of the damaging evidence against her resulted from Husband's legal maneuvering during the course of litigation, which she argues should not serve as the basis of the court's decision on parental responsibility. She concludes the trial court abused its discretion when it named Husband primary residential parent, as well as when it restricted her parenting time without finding a substantial risk of harm to the children.

Wife, however, cites to virtually no facts in the record to support her position.[26] She has resultantly failed to demonstrate the evidence preponderates against the factual findings underlying the court's decision or to provide any basis upon which to overturn the trial court's resolution of conflicting expert testimony in favor of Dr. Steinberg. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005) (citation omitted) (stating "[t]he weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact"); *Johnson v. Mid Wesco, Inc.*, 801 S.W.2d 804, 806 (Tenn. 1990) (citation omitted) (recognizing trial courts have discretion to accept the opinion of one expert over that of another); *Estate of Fetterman v. King*, 206 S.W.3d 436, 445 (Tenn. Ct. App. 2006) (citation omitted) (explaining the resolution of conflicting expert testimony falls within the province of the trier of fact). Additionally, Wife has failed to persuade us the trial court abused its discretion during its evaluation of the relevant statutory factors.

The closer question is whether the trial court abused its discretion when it limited Wife's award of parenting time to supervised visitation. Tennessee Code Annotated section 36-6-406 permits a court to limit a parent's residential parenting time. It provides, in pertinent part:

> (d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:

---

[26]Wife's brief consistently violates Rule 27 of the Tennessee Rules of Appellate Procedure which provides, in pertinent part:

> (a) Brief of the Appellant. The brief of the appellant shall contain under appropriate headings and in the order here indicated:
>
> . . . .
>
> (7) An argument, which may be preceded by a summary of argument, setting forth:
>> (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and
>> (B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues);
>
> . . . .
>
> (g) Reference in Briefs to the Record. Except as provided in rule 28(c), reference in the briefs to the record shall be to the pages of the record involved. Intelligible abbreviations may be used. If reference is made to evidence, the admissibility of which is in controversy, reference shall be made to the pages in the record at which the evidence was identified, offered, and received or rejected.

Tenn. R. App. P. 27.

(1) A parent's neglect or substantial nonperformance of parenting responsibilities;

(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;

(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;

(4) The absence or substantial impairment of emotional ties between the parent and the child;

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;

(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;

(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Tenn. Code Ann. § 36-6-406(d)(1)–(8) (2010). In addition, the parenting plan statute requires the trial court to "[m]inimize the child's exposure to harmful parental conflict." Tenn. Code Ann. § 36-6-404(a)(3).

We conclude the trial court did not abuse its discretion in allocating parental responsibility under the facts of this case, especially where the unusual and potentially harmful events concerning the children ceased after the court ordered supervision of Wife's parenting time on a temporary basis. We conclude the court properly accounted for the relevant statutory factors when it named Husband primary residential parent. Also, the trial court restricted Wife's unsupervised parenting time only upon a finding of facts supporting its restriction. To the extent the trial court erred by not expressly stating its reliance on Tennessee Code Annotated section 36-6-406, we conclude the evidence in the record supports the imposition of supervised parenting time as set forth in the trial court's order.[27] We expressly find Wife's instability, mental health issues, abusive use of litigation to create conflict, refusal to promote a relationship between the children and their father, and attempt to remove the children from the jurisdiction are all such factors adverse to the best interests of the children and which support supervision of her parenting time. We find definite evidence in the record to demonstrate that awarding Wife unsupervised parenting time would jeopardize the children physically and emotionally.

We disagree with the suggestion that Tennessee Code Annotated section 36-6-301 precludes the imposition of supervised parenting time under the facts. That provision states:

---

[27]Due to Wife's decision not to procure the verbatim trial transcript, we are unable to determine whether additional testimony exists to support the court's decision.

After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health. In granting any such rights of visitation, the court shall designate in which parent's home each minor child shall reside on given days of the year, including provisions for holidays, birthdays of family members, vacations and other special occasions. If the court finds that the non-custodial parent has physically or emotionally abused the child, the court may require that visitation be supervised or prohibited until such abuse has ceased or until there is no reasonable likelihood that such abuse will recur. The court may not order the department of children's services to provide supervision of visitation pursuant to this section except in cases where the department is the petitioner or intervening petitioner in a case in which the custody or guardianship of a child is at issue.

Tenn. Code Ann. § 36-6-301 (2010). The trial court granted Wife such rights as will enable her to maintain a parent-child relationship with her children if she so chooses. Although a finding of emotional or physical abuse permits the imposition of supervised visitation under the cited statutory provision, we disagree that restriction of Wife's parenting time is appropriate only upon such findings. The plain language of Tennessee Code Annotated section 36-6-301 suggests restriction of visitation is appropriate if unsupervised visitation "is likely to endanger the child's physical or emotional health." Tenn. Code. Ann. § 36-6-301. Tennessee Code Annotated section 36-6-406 likewise permits the limitation of any provision of a parenting plan, including the provision related to the residential schedule. In light of our previous conclusion that Tennessee Code Annotated section 36-6-406 applies here, we find ample support for the award of supervised parenting time. The trial court's allocation of parental responsibility is affirmed.

### D. Transmutation & Commingling

The next question before this Court is whether the trial court erred when it classified the Germantown residence and its furnishings as separate property.[28] The first step in dividing a marital estate is to identify all of the parties' property interests. *Keyt*, 244 S.W.3d at 328 (citation omitted). The next step is to classify the property as either marital or separate. *Id.* (citations omitted). The correct classification of property is essential because the statutory provisions governing divorce provide only for the equitable distribution of marital property. *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988) (citation omitted). Parties are entitled to their separate property without consideration of the equities between them. *Id.* "Because the courts do not have the authority to make an equitable distribution of separate property, whether separate property should be considered marital is a threshold matter." *Keyt*, 244 S.W.3d at 328 (citation omitted). "As such, a spouse seeking to include the other spouse's separate property in the marital estate has the burden of proving

---

[28]Wife concedes in her brief that Husband acquired the furnishings at issue during the purchase of the Germantown residence.

that the property fits within the statutory definition of marital property." *Id.* (citation omitted).

All real and personal property acquired prior to a marriage is separate property. Tenn. Code Ann. § 36-4-121(b)(2)(A). Separate property may nevertheless become part of the marital estate under the doctrines of transmutation and commingling. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002).

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Eldridge v. Eldridge*, 137 S.W.3d 1, 13-14 (Tenn. Ct. App. 2002) (quoting *Batson,* 769 S.W.2d at 858); *accord Woodward v. Woodward*, 240 S.W.3d 825, 829 (Tenn. Ct. App. 2007) (quoting *Langschmidt*, 81 S.W.3d at 747). "The related doctrine of commingling concerns instances where separate property becomes marital property when the separate property is inextricably mingled with marital property or the other spouse's separate property." *Eldridge*, 137 S.W.3d at 14 (citation omitted). "Commingling does not occur if the separate property can be traced into its product or if the separate property continues to be segregated." *Id.* (citation omitted).

The trial court determined the Germantown residence and its furnishing were separate property. The court relied on the following facts: (1) Husband purchased the home before the parties married in October 2004; (2) Husband purchased the home solely with his funds; (3) the deed and promissory note to the property were in Husband's name only, (4) Wife's signature was not found on any deed to the property or any closing documents; (5) Wife provided no evidence to show she made a substantial contribution to the preservation and appreciation of the home during the marriage; (6) Husband lived at the home, paid the notes on the property, and maintained the property the entire period during which they lived there as a married couple; and (7) Husband took no action to demonstrate transmutation of the property to marital property. The court further found certain vehicles owned prior to the marriage were the separate property of the parties and that Wife's clothing was her separate property. It concluded each party was "vested with his or her separate property, free and clear of any claim by the other."

Wife argues the trial court erred when it determined the Germantown residence and its

furnishings were separate property.[29] She contends without a single citation to evidence in the record that the trial court erroneously classified said property as separate "relying only on the record title and the fact that the Husband purchased the home prior to the marriage." Wife submits in her brief:

> In this case, there is no dispute that the parties had a joint bank account from which the Husband drew the money for the down payment of the marital residence ($74,000). There is no dispute that the parties resided together in California prior [to] the Husband's purchase of the home and that the Wife came to Tennessee and moved into the residence with the Husband. There is also no dispute that the Husband continued to use his income (marital property) to pay the mortgage indebtedness through the marriage and divorce process.

Wife concludes these alleged facts demonstrate her right to "at least one-half of the fair market value (or at least one-half of the down payment) and one-half of the furnishings from the real property. . . ." We disagree.

Wife has failed to demonstrate that the evidence preponderates against the trial court's factual findings or that the trial court erred as a matter of law. She does not cite a single piece of evidence to support her assertions, nor does the evidence in the record contradict the court's findings. The statement of the evidence shows Wife agreed at trial that Husband purchased the Germantown residence prior to their marriage with proceeds from the sale of his California home. Although she purportedly helped Husband renovate the California home prior to its sale, she was unable to produce any receipts or records demonstrating she invested funds in the California property or obtained an ownership stake in the property. While Husband concedes the parties established a joint bank account prior to the marriage, he testified he purchased the home solely with funds traceable to his separate assets.

As Husband explains in his brief, the trial exhibits supported a finding that he purchased the Germantown residence with his separate funds. The trial exhibits showed he and Wife funded the joint bank account with checks to Husband in the amount of $96,795 and a single check to Wife in the amount of $300. These deposits included one $80,000 check transferring funds from Husband's separate checking account at Chaffey Credit Union, which represented proceeds from the sale of his California home. Husband testified he thereafter purchased the Germantown residence with a portion of these funds, withdrawing $74,000 from the joint bank account. Our review of the record supports Husband's description of these exhibits. We accordingly find the evidence does not preponderate against the trial court's conclusion that Husband purchased the Germantown residence with solely his funds prior to the marriage.

The remaining question is whether the evidence in the record demonstrates that transmutation or commingling occurred. We agree with Wife's assertion that record ownership of an asset does

---

[29]Wife's brief reproduces lengthy passages from prior cases addressing transmutation and commingling but does not establish which doctrine she relies on here.

not always control its classification. *See Altman v. Altman*, 181 S.W.3d 676, 680-81 (Tenn. Ct. App. 2005). Courts may consider several factors when determining whether transmutation has occurred, including:

> (1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property.

*Fox v. Fox*, M2004-02616-COA-R3-CV, 2006 WL 2535407, at \*5 (Tenn. Ct. App. Sept. 1, 2006) (citation omitted). The trial court placed little reliance on Wife's brief stay at the Germantown residence as a factor demonstrating transmutation. The court instead emphasized facts showing Husband never titled the residence in Wife's name, her name never appeared on the documents related to its purchase, and Husband maintained the property at all times during the marriage. Additionally, Husband testified the residence remained titled in his name only, even though Wife had asked him to title the property jointly. Having reviewed the record, we agree with the trial court's determination that transmutation did not occur. We further conclude Wife has not demonstrated that commingling occurred. We accordingly affirm the trial court's classification of the Germantown residence and its furnishings as separate property.

### E. Alimony

The next question before this Court is whether the trial court abused its discretion when it awarded Wife four months of transitional alimony in the amount of $2,500. Tennessee Code Annotated section 36-5-121 provides courts discretion to award spousal support "according to the nature of the case and the circumstances of the parties." Tenn. Code Ann. § 36-5-121(a) (2010). This discretion includes authority to award "rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, or alimony in solido, also known as lump sum alimony or a combination of these . . . ." Tenn. Code Ann. § 36-5-121(d)(1). The intent of the General Assembly is that "a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony." Tenn. Code Ann. § 36-5-121(d)(2) (2010).

Rehabilitative alimony is, however, sometimes insufficient to support the requesting spouse. At other times, it is unnecessary. The Code therefore provides a number of options courts may consider when evaluating the issue of alimony. Courts may order the payment of long-term support until the death or remarriage of the recipient where there is relative economic disadvantage and rehabilitation is not feasible, Tenn. Code Ann. § 36-5-121(d)(3); the payment of alimony in futuro instead of rehabilitative alimony if rehabilitation of the recipient is not feasible; Tenn. Code Ann. § 36-5-121(d)(4); the payment of alimony in futuro in addition to rehabilitative alimony if a spouse can only be partially rehabilitated, Tenn. Code Ann. § 36-5-121(d)(4); the payment of transitional alimony if the court finds that rehabilitation is unnecessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or

other proceeding, Tenn. Code Ann. § 36-5-121(d)(4); and the payment of alimony in solido in lieu of, or in addition to, any other alimony award where appropriate, Tenn. Code Ann. § 36-5-121(d)(5).

Tennessee Code Annotated section 36-5-121(i) sets forth the factors governing a trial court's decision to award alimony, if any, to a requesting spouse:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i)(1)–(12) (2010).

It is well-settled that the two most important factors relating to a trial court's award of alimony are the need of the economically disadvantaged spouse and the opposing spouse's ability to pay. *E.g. Watson v. Watson*, 309 S.W.3d 483, 497-98 (Tenn. Ct. App. 2009) (citation omitted); *Williams v. Williams*, 286 S.W.3d 290, 295-96 (Tenn. Ct. App. 2008) (citations omitted). The trial court's evaluation of the relevant factors is nevertheless entitled to considerable deference on appeal. "The amount, if any, and type of alimony to be awarded is within the sound discretion of the trial court in view of the particular circumstances of the case and a consideration of the relevant factors

set forth in Tenn. Code Ann. § 36-5-121(i)(1-12)." *Farnham v. Farnham*, 323 S.W.3d 129, 143 (Tenn. Ct. App. 2009); *accord Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995). "Appellate courts are, therefore, reluctant to second guess a trial court's decision regarding alimony 'unless it is not supported by the evidence or is contrary to the public policy embodied in the applicable statutes.'" *Watson*, 309 S.W.3d at 497 (quoting *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994)).

Wife contends the trial court abused its discretion when it awarded her short-term, transitional alimony. Her main contention is that the trial court focused too heavily on the brevity of the marriage when evaluating the issue of alimony. She also argues, again without sufficient citation to evidence in the record to support her factual assertions, that the trial court should have focused more on the disparity of the parties' income, Husband's admitted affair, and her significant financial need. Wife concludes the court's award did not provide sufficient funds to aid her transition back into the workplace. She accordingly requests an award of rehabilitative alimony for three years in the amount of $3,200 per month.

Husband argues the trial court did not abuse its discretion. He argues the trial court appropriately considered the above statutory factors when awarding alimony. Husband argues Wife has not demonstrated a need for further education given her Bachelor's Degree in Architecture, Master's Degree in Architecture, and Master's Degree in Real Estate Development. Husband further argues Wife refused to work during the pendency of these proceedings despite the admonishments of the trial court and despite establishing no physical condition that would prevent her from obtaining a job. Additionally, Husband contends his ability to pay has diminished greatly as a result of these proceedings, despite his monthly income of approximately $22,000. Husband explains the present divorce litigation has significantly burdened his financial estate, as well as required him to support the parties' children since December 2005 without any assistance from Wife. Husband points to additional factors supporting the trial court's decision including Wife's conduct before and during the divorce, the brevity of the marriage, and the resulting lack of change in Wife's standard of living.

Having reviewed the record, we find no abuse of discretion in the trial court's decision. The court expressly relied on the short duration of the marriage, the age and mental condition of the parties, the standard of living during the marriage, and the provisions made with regard to the marital property when evaluating this issue. Wife has not demonstrated the trial court erred when it relied on these factors nor has she pointed to evidence in the record that would compel a contrary conclusion. The determination of alimony lies within the discretion of the trial court, which it has appropriately exercised under the facts of this case. We affirm the trial court's decision to award Wife four months of transitional alimony in the amount of $2,500.

### F. Attorney's Fees

We next consider whether the trial court abused its discretion when it declined to award attorney's fees to Wife. Courts often treat an award of attorney's fees as alimony in solido. *Watson*,

309 S.W.3d at 500 (citing *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *see also Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988) (citing *Crouch v. Crouch*, 385 S.W.2d 288, 294 (Tenn. Ct. App. 1964)). As with any other award of alimony, the determination of whether to award attorney's fees "is a matter for the discretion of the trial court in view of the particular circumstances." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995) (quoting *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986) (internal quotation marks omitted). Trial courts have discretion to determine whether the relevant statutory factors warrant an award of attorney's fees in a given case. *Owens v. Owens*, 241 S.W.3d 478, 495-96 (Tenn. Ct. App. 2007) (citations omitted). Appellate courts will not interfere with that determination unless the trial court abuses its discretion. *Aaron*, 909 S.W.2d at 411; *Watson*, 309 S.W.3d at 500 (citation omitted).

An award of attorney's fees is appropriate in most cases where the record shows one spouse needs an award of fees to defray the costs of litigation and the other party has the ability to pay it. *Fickle v. Fickle*, 287 S.W.3d 723, 737 (Tenn. Ct. App. 2008) (citing *Riggs v. Riggs,* 250 S.W.3d 453, 460 (Tenn. Ct. App. 2007); *Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980)). It is also appropriate where the economically disadvantaged party incurs increased litigation expenses due to the obstructionist tactics and legal maneuvering of the opposing spouse. *Id.*; *Gilliam*, 776 S.W.2d at 86-87. It follows, however, that courts may consider whether the economically disadvantaged spouse is the party guilty of using the judicial process as a retaliatory weapon. *See* Tenn. Code Ann. § 36-5-121(i)(12) (permitting reliance on such other factors "as are necessary to consider the equities between the parties"). The fact that the party engaging in a course of conduct creating substantial and otherwise unnecessary attorney's fees is less financially secure than the bread-winning spouse does not immunize his or her conduct. Further, the financial status of the culpable party should not dissuade the court from discouraging such conduct in the future through either the withholding or limitation of a fee award.

Wife argues the trial court abused its discretion when it made her responsible for the attorney's fees she incurred during this lengthy divorce case. She submits Husband's actions primarily caused her to incur a substantial portion of her attorney's fees during the course of litigation. She argues, for example, that Husband's actions necessitated her defense of a dependency and neglect action, her filing of a federal lawsuit to stop harassment by a Memphis police officer, her attendance at multiple costly psychological evaluations, and her payment of increased fees to spend time with her children.[30] Wife adds that an award of fees is appropriate because Husband is in a better position to pay them. She concludes the trial court abused its discretion and asks this Court to remand this case for a determination on the amount of Wife's fees that Husband must pay.

Husband responds that Wife primarily caused the enormous expense associated with this case. He argues:

---

[30]We note other parties filed dependency and neglect petitions which also required Wife to defend a charge of dependancy and neglect. Further, Wife consented to the second and third psychological evaluations.

i.  It was Wife that alleged that Husband had attacked her and children on November 30, 2005, but could provide no evidentiary support of her allegation, resulting in the matter being brought before the Juvenile Court.

ii.  It was Wife who claimed Husband put gasoline on one of the minor children, resulting in a second Juvenile Court hearing. Wife provided no evidentiary support for the allegation aside from her allegation.

iii.  It was Wife who made claim that Husband had raped her. Wife provided no evidentiary support for the allegation aside from her allegation.

iv.  It was Wife who initiated action in California during the pendency of proceedings in Tennessee in an attempt to circumvent the Tennessee Courts.

v.  It was Wife who initiated litigation against multiple parties, including potential fact witnesses for Husband, all arising out of this divorce action.

vi.  It was Wife who initiated litigation against Husband's lawyer.

vii.  It was Wife who made false affidavit and attempted to garnish Husband's wages, even though there was no Court Order supporting such.

viii.  It was Wife that obtained Counsel in California in a second attempt to have California take jurisdiction regarding the minor children.

Our review of the record supports a conclusion that both parties contributed to the attorney's fees incurred during this case. It further reveals, however, that Wife initiated the majority of the costly, time-consuming, and needless disputes. It was Wife who continuously hurled accusations without evidentiary support. It was Wife who initiated proceedings in California in an effort to contravene the pending Tennessee custody orders. And, as the trial court expressly found, it was Wife who would not seek closure in this "seemingly endless litigation."[31] We therefore find no abuse of discretion in the trial court's decision to deny Wife's request for attorney's fees.

### G. Guardian Ad Litem Fees

We consider as a final matter whether the trial court abused its discretion when it required Wife to pay half of the GAL's fees previously ordered by the court and half of the balance due to the GAL in the amount of $17,000. Rule 17.03 of the Tennessee Rules of Civil Procedure permits the appointment of a guardian ad litem "to defend an action for an infant or incompetent person who

---

[31]It is also Wife who has continued a similar course of action on appeal. Whereas the appellate filings in a typical divorce case fit neatly within a single legal-size folder, the filings in this case occupy an entire banker's box.

does not have a duly appointed representative, or whenever justice requires." Tenn. R. Civ. P. 17.03. It also provides a trial court discretion to "allow the guardian ad litem a reasonable fee for services, to be taxed as costs." *Id.* Appellate courts accordingly review an award of guardian ad litem fees for an abuse of discretion. *Keisling v. Keisling,* 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005) (citations omitted).

Wife challenges the reasonableness of the GAL's fee request, suggesting the GAL did not provide an itemized billing statement for the additional request of $17,000. Wife contends, analogizing to an award of attorney's fees, that the party seeking an award of guardian ad litem fees bears the burden to demonstrate the requested fees are reasonable and related to the litigation. She raises various arguments about the responsibility of the person requesting fees to present an affidavit or other proof itemizing the fees, the right of a party opposing the request to cross-examine the requesting person as to the reasonableness of the fees, and the ability of the trial court to rely on its knowledge of the case to determine a reasonable fee.

Wife's position suffers from a fatal deficiency, however, even if we assume *arguendo* that decisions evaluating the reasonableness of an attorney's fees award provide guidance on the issue before us. Wife cites to nothing in the record to demonstrate whether the GAL testified regarding her services, whether the trial court denied Wife an opportunity to cross-examine the GAL with respect to the reasonableness of her fees or to present evidence on what a reasonable fee would be, whether the trial court made its determination based on an independent evaluation of the relevant factors, whether Wife disputed the amount of the fee at trial, or whether Wife was denied an opportunity to challenge the reasonableness of the GAL's fee through no fault of her own. *See generally Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 831 (Tenn. Ct. App. 2009) (discussing the law applicable to a request for attorney's fees); Robert E. Burch, *Trial Handbook for Tennessee Lawyers* § 33:16 (2009-2010 ed.) (same). The record is silent on what transpired at trial with regard to guardian ad litem fees. We must therefore presume the evidence supported the award of fees and are unable to conclude the trial court abused its discretion.[32] We affirm the trial court's award of guardian ad litem fees.

## V. Conclusion

Divorce cases can be emotional, difficult affairs. This divorce has been especially contentious. The parties' animosity towards one another has grown to the point where the trial court felt it necessary to prohibit the parties from contacting each other for any reason except where absolutely necessary. We wish it were not the case, but the trial court's action appears entirely

---

[32]We note, however, the GAL filed at least one affidavit containing an itemized billing statement with the trial court prior to trial. This affidavit contains a detailed list of the GAL's time and efforts. It demonstrates the GAL dedicated nearly 250 hours to this dispute between July 1, 2006, and February 8, 2007, much of which Wife necessitated. Also, we note the pure volume of filings before the trial court, the seriousness of the allegations made, and the overall divisiveness of this case suggest the award of guardian ad litem fees was entirely reasonable.

-38-

prudent under the facts. The parties offer no suggestion to the contrary. The resolution of this divorce case, however, will not conclude the opportunities for dispute between Husband and Wife. As we have seen in similar divorces cases, the entry of a final decree is often seen as nothing but an invitation to move for its modification. We nevertheless hope the parties will exercise restraint as they move forward, focusing on the best interests of their children.

We admonish the parties, particularly Wife, to consider the following statement one Tennessee trial judge traditionally shares with parents involved in a parenting dispute:

> Your children have come into this world because of the two of you. Perhaps you two made lousy choices as to whom you decided to be the other parent. If so, that is your problem and your fault.

> No matter what you think of the other party–or what your family thinks of the other party–those children are one half of each of you. Remember that, because every time you tell your child what an idiot his father is, or what a fool his mother is, or how bad the absent parent is, or what terrible things that person has done, you are telling the child that half of him is bad.

> That is an unforgivable thing to do to a child. That is not love; it is possession. If you do that to your children, you will destroy them as surely as if you had cut them into pieces, because that is what you are doing to their emotions.

> I sincerely hope you do not do that to your children. Think more about your children and less of yourselves, and make yours a selfless kind of love, not foolish or selfish, or they will suffer.

Ash, *supra*, at 771-72 (quoting a letter from Judge Dotson Haas, Walker, Minnesota that Judge Don Ash traditionally recites) (internal quotation marks omitted). The time, effort, and money spent in continual litigation not only harms the parties emotionally and financially, but it also harms those who have no choice in the matter: their children. The parties' tumultuous time together is over. We hope they will now focus to the best of their ability on providing a nurturing environment for their children.

For the foregoing reasons, we affirm the decision of the trial court and remand for consideration of any outstanding petitions for contempt. Costs of this appeal are taxed to the appellant, Danielle Malmquist, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE
